**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**DENNIS MARCUM, JR.,**

     **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 2:16-02297**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered March 14, 2016 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 14 and 17.)

The Plaintiff, Dennis Marcum, Jr. (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on July 31, 2012, alleging disability beginning January 1, 2010 due to "stroke, neurocardiosyncopy, lymphoma, restless leg syndrome, and sleep apnea".[1] (Tr. at 169.) His claim was denied on April 22, 2013 (Tr. at 78-82.) and again upon reconsideration on

---

[1] In his Disability Report – Appeal, submitted on November 8, 2013, Claimant alleged that since his last Disability Report submitted on May 8, 2013, his "[h]eart problems have worsened. Blood pressure has worsened. Knee problems have worsened." (Tr. at 201.) Further, Claimant alleged that his "[s]leep apnea has worsened. Restless leg syndrome has worsened. Seizures have worsened." (<u>Id.</u>)

September 10, 2013. (Tr. at 86-92.) Thereafter, Claimant filed a written request for hearing on November 13, 2013. (Tr. at 93-94.) An administrative hearing was held on November 3, 2014 before Administrative Law Judge ("ALJ") Peter Jung; the ALJ heard the testimonies of Claimant and Vocational Expert ("VE") Olen Dodd. (Tr. at 27-51.) On November 7, 2014, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 10-26.)

The ALJ's decision became the final decision of the Commissioner on January 11, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) On March 10, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . .." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

3

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant last met the requirements for insured worker status through December 31, 2014. (Tr. at 15, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of January 1, 2010. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: cardiac dysrhythmias/late effects of transient ischemic attack (TIA); chronic obstructive pulmonary disease (COPD); and history of Hodgkin's lymphoma. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 17, Finding No. 4.) Next, the ALJ found that Claimant had a residual functional capacity ("RFC") to perform light work as defined in the Regulations:

> [E]xcept he can lift up to 20 pounds occasionally and 10 pounds frequently. He can stand and walk for 6 hours in an 8-hour workday, and can sit for 6 hours in an 8-hour workday. He can never climb ladders, ropes, or scaffolds. He can occasionally

climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can never be exposed to jobs involving hazards, machinery, or heights. He should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (Id., Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 21, Finding No. 6.) At step five of the analysis, the ALJ found that having been born on July 19, 1967 and 42 years old, Claimant was a younger individual on the alleged onset date. (Id., Finding No. 7.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Id., Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled though the date last insured, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 9 and 10.) On that basis, the ALJ found Claimant was not disabled from January 1, 2010 through the date of the decision. (Tr. at 22, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Issues on Appeal

The grounds of alleged error presented by Claimant in his appeal are: (1) whether the ALJ failed to consider all of the medical evidence of record, rendering the disability determination unsupported by substantial evidence; and (2) whether the ALJ failed to perform an adequate step three analysis, rendering the decision unsupported by substantial evidence. (Document No. 14 at 7.)

Claimant's Background

At the time of the alleged onset date through the date of the ALJ's decision, Claimant was considered a "younger individual". (Tr. at 21.) See 20 C.F.R. § 404.1563(c). He obtained his GED and completed one year of college (Tr. at 31.) and is certified as an ASE diesel mechanic. (Tr. at 45.) His past relevant work experience included supervisor at an insulation contracting company, a mechanic and a technical engineer. (Tr. at 32.)

The Relevant Evidence of Record[3]

Treatment for Cardiac Impairment:

A medical consultation at the Bureau of Prison Health Services in March 2011 shows that

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Claimant had a history of two episodes of syncope from 1997 to 1998, and six episodes in 2009. (Tr. at 589.) Since placement of the pacemaker in June 2010 at Cleveland Clinic (Tr. at 825.), he had experienced only one episode of syncope. (Id.)

In April 2011, Claimant presented to the University of Kentucky Hospital from prison for a history of a cerebrovascular accident (CVA) (i.e., a stroke) versus a transient ischemic attack (TIA) (a neurological event with the signs and symptoms of a stroke) with a new onset of right-sided weakness and numbness; electrocardiogram (ECG) testing indicated "nonspecific T wave abnormality." (Tr. at 226, 239-240.) He was assessed with a TIA. (Tr. at 254.) His right-sided weakness improved over a short period of time. (Id.) A hospital workup showed no acute findings concerning a stroke. (Tr. 256, 342). A carotid Doppler, echocardiogram, and CT of the head were all normal. (Tr. at 256.) Claimant was discharged with instructions to add 325 mg. of aspirin per day to his home medications. (Id.)

In August 2012, treatment records from the University of Kentucky Hospital show that Claimant had a history of paroxysmal atrial fibrillation and neurocardiogenic syncope status post implantation of a pacemaker in June 2010. (Tr. at 293-294, 300.) His blood pressure was well-controlled on medication. (Id.) Claimant had some episodes of paroxysmal atrial fibrillation (irregular heartbeat) during which his heart rate was elevated above 110 beats per minute. (Tr. at 302.) In late August 2012, his medication was adjusted to add an anticoagulant, because he had been taking only aspirin for atrial fibrillation and prevention of stroke while in the Federal Medical Center - Bureau of Prisons system. (Tr. at 317.)

In October 2012, Claimant presented to Charleston Area Medical Center due to sudden onset of chest discomfort (Tr. at 664.); physical examination of his heart indicated regular rate and

rhythm, no murmurs, rubs or gallops auscultated. (Tr. at 665-666.) An ECG documented bradycardia. (Tr. at 667-675.) Further CT studies indicated Claimant had "[n]ormal home coronary arteries" (Tr. at 690.), and "very mild – less than 30% stenosis noted at the left [and] right internal carotid arter[ies]". (Tr. at 697.)

In March 2013, Claimant sought emergency room treatment at Charleston Area Medical Center for complaints of a headache and the possibility of another "stroke". (Tr. at 1003-1006.) He had been at home, replacing his car engine, and was getting up when he began to not feel well and developed a severe headache. (Tr. at 1007.) Following an evaluation, he was assessed with a TIA. (Tr. at 1001.) A CT of the head failed to show any clear-cut abnormalities. (Tr. at 1008.) A bilateral carotid duplex showed very mild less than 30% stenosis in the right with mild 30% to 50% in the left internal carotid artery. (Tr. at 1009.)

In July and September of 2013, Claimant was seen by Frederick Jaeger, D.O. at the Cleveland Clinic to evaluate his pacemaker. (Tr. at 762-768, 763-785.) At the evaluation in July 2013, Claimant denied recurrent syncope; but reported some episodes of atrial tachycardia and possibly atrial flutter. (Tr. at 765.) Dr. Jaeger conferred with Claimant's local cardiologist and they both agreed that he should be on anti-coagulation medication; Claimant had recently stopped taking Pradaxa, an anticoagulant, due to muscle pain. (Id.) A detailed review of symptoms, signs, and physical examination revealed no arm swelling, syncope, pre-syncope, or pocket stimulation related to the pacemaker. (Tr. at 764.)

At the evaluation in September 2013, Claimant denied chest pain, shortness of breath, orthopnea, cough, edema, PDN, lightheadedness, or syncope. (Tr. at 770.) A detailed review of symptoms, signs, and physical examination remained the same as in July, with no syncope or pre-

syncope. (Tr. at 772.) Claimant was scheduled for follow-up review with telephone analysis every three months and a yearly clinical analysis. (Tr. at 764, 772.)

Treatment for Knee Impairment:

In August 2014, Claimant was seen by Dr. Clark Adkins with Bone and Joint Surgeons, Inc.[4] because Claimant jumped out of the back of a pick-up truck with a 100 lb. bag of animal feed and had an acute onset of pain in his foot. (Tr. at 922.) Claimant also had left knee pain which was assessed as a torn medial meniscus. (Tr. at 923.) The following month, Claimant had left knee arthroscopy and partial medial meniscectomy. (Tr. at 926.)

Medical Records Referencing Obesity:

In May 2011, Claimant was seen in the Cardiology Clinic at the Gill Heart Institute by Drs. Booth and Holbrook. (Tr. at 367.) In addition to TIA, hypertension, left ventricular systolic dysfunction with dilated cardiomyopathy and concentric left ventricular hypertrophy, hyperlipidemia, history of neurocardiogenic syncope, Claimant was assessed with obesity, and encouraged to lose weight and "shoot for a target weight between 180 and 200." (Tr. at 368.) In August 2012, Claimant presented at the University of Kentucky emergency department due to atrial fibrillation, and upon admittance and discharge, one of the diagnoses included obesity (Tr. at 312.) and that he needed to "[w]ork towards or maintain a healthy weight." (Tr. at 313, 315.)

Claimant's Adult Function Report:

Claimant stated that he lived in a house with his family. (Tr. at 180.) In his daily activities, he read, watched television, cooked, washed laundry, and rested. (Id.) He had no problem with personal care (Id.), and needed no reminders to take care of his personal needs or take his

---

[4] In May 2006, Claimant had a partial medial meniscectomy to his right knee by Dr. Adkins. (Tr. at 907.)

medication. (Tr. at 181.) Claimant was able to prepare complete meals daily, with no change in his cooking habits since his conditions began, and iron and clean without assistance. (Id.) When he went outside, he walked, drove or rode in a car, or used public transportation. (Tr. at 182.) He shopped in stores for food, clothing, and household supplies for two hours, weekly. (Id.) He was able to handle all aspects of managing money. (Id.) He spent time with others talking, walking, or playing games, and attended church weekly. (Tr. at 183.)

Claimant stated that his stroke affected his ability to lift, squat, bend, and climb stairs, but he was able to walk for "15 minutes/1 mile" with resting every ten minutes. (Tr. at 184.) He claimed that his stroke affected his memory and concentration, but he was able to pay attention as long as needed, finish what he began, and follow instructions well. (Id.)

State Agency Medical Consultants:

On April 19, 2013, Pedro Lo, M.D. reviewed the medical and other evidence of record and concluded that Claimant could perform light work (Tr. at 59.) with the following limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; unlimited push/pull other than shown for lift/carry; occasionally climb ramps, stairs, balance, stoop, kneel, crouch, crawl and never climb ladders, scaffolds or ropes. (Tr. at 57-58.) Dr. Lo opined the postural limitations were "due to neurocardiogenic syncope; paroxysmal atrial fibrillation. Most attacks controlled with the inserted cardiac pacer and medications. Last episode recorded was in June 2012." (Tr. at 58.) Dr. Lo found no manipulative, visual, or communicative limitations, but opined Claimant should avoid extreme cold and heat, avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor

ventilation and avoid all exposure to hazards. (Tr. at 58-59.) On August 21, 2013, Curtis Withrow,

M.D. affirmed Dr. Lo's assessment. (Tr. at 71-73.)


<u>State Agency Medical Examiner:</u>

In April 2013, Dr. Kip Beard examined Claimant. (Tr. at 745-754.) Claimant reported a

history of neurocardiogenic syncope for which he received a pacemaker in 2010. (Tr. at 745.)

Since then, he stated that had experienced three episodes of syncope, the most recent in June 2012.

(<u>Id</u>.) Claimant reported no frequent hospital visits related to syncope. (<u>Id</u>.) He reported a history

of a stroke in 2009, with residual right-sided weakness, and a history of Hodgkin's lymphoma,

diagnosed in 2008, but now in remission. (Tr. at 745-746.)

Regarding Claimant's complaints of difficulty breathing, Dr. Beard noted that spirometry

testing revealed moderate chronic obstructive pulmonary disease (COPD), but an examination

revealed no significant clinical exertional dyspnea or evidence of wheezes, rales, or rhonchi. (Tr.

at 748.) A cardiovascular examination revealed a regular heart rate and rhythm and no murmurs,

gallops, or rubs. (<u>Id</u>.) A musculoskeletal examination was essentially normal with no deficits in

range of motion. (Tr. at 748-749.) A neurological examination revealed no sensory loss or atrophy.

(Tr. at 749.) Regarding Claimant's complaints of right-sided weakness, Dr. Beard indicated that

his examination findings were unreliable because Claimant demonstrated give-way weakness and

diminished effort on manual muscle testing. (Tr. at 750.) Regarding Claimant's complaints of knee

pain, Dr. Beard's examination revealed no weakness or appreciable atrophy. (<u>Id</u>.)

<u>The Administrative Hearing</u>

<u>Claimant Testimony:</u>

12

He testified that he was right handed, six feet one-inch tall, and weighed two hundred seventy-two pounds. (Tr. at 31.) Claimant testified that he had not worked since January 1, 2010. (Id.) He stated that he had worked from 2000 through 2009 as a supervisor at an insulation contracting company, climbing ladders and climbing around in attics; though he was a supervisor, he still also performed the job. (Tr. at 31-32.) He stated that he was a mechanic from January 2001 to 2005 and a technical engineer from 2000 to 2001. (Tr. at 32.)

Claimant testified that he became disabled in January 2010 due to difficulty breathing related to his heart condition. (Id.) He testified that he became unable to work due to some issues with his breathing and his heart without being able to find out what was wrong. (Tr. at 33.) On one visit to the hospital, his heart stopped and doctors were able to determine what was happening and he was diagnosed with neurocardiacsyncopy. (Id.) His doctors told him to take it easy and they referred him to the Cleveland Clinic. (Tr. at 33-34.) He testified that he had episodes a couple of times a month until he had a pacemaker put in, and after he had the pacemaker, he had three more episodes. (Tr. at 34.) He had many episodes of atrial fibrillation and had heart ablation to address it. (Id.)

Claimant testified that he also had been treated in 2009 for Hodgkin's lymphoma, with the removal of a lymphoma in his lower right groin area, and he has had recurrent polyps in his esophagus, some of which were pre-cancerous. (Tr. at 35.) He stated that a spot on his lung had been detected two years previously, and before the hearing he had a CT scan done because it was determined that the spot was growing and he had an upcoming appointment with a pulmonologist to discuss lung surgery. (Tr. at 35-36.)

When asked to identify the primary reason he could not work, he stated "the ability to stay

focused" and voiced concern that he would experience sudden cardiac symptoms without warning which could endanger himself and others. (Tr. at 36.) He stated that his breathing had gotten increasingly worse and that it took him forever to do a simple task. (Id.)

Claimant testified that he was incarcerated from December 2010 to August 2012 for receiving stolen property (an automobile). (Tr. at 36-37.) He was on parole at the time of the hearing. (Tr. at 37.) He testified that while he was incarcerated he was required to work four hours a day, sitting and watching meters and pulling a button for help if the needle went in to the red zone. (Id.) He stated he did not have any trouble doing that for four hours but did not believe he could have done it for eight hours because the sitting bothered him. (Tr. at 37-38.)

Claimant testified that he had experienced two strokes in the past and he had some residual weakness on his right side, although he had recovered about seventy-five percent of the use of that side. (Tr. at 38.) He testified that the right sided weakness prevented him standing more than about fifteen minutes at a time, and he could walk no further than twelve or fourteen blocks if he pushed himself. (Id.) He stated that sitting also gave him trouble, estimating that he could sit for half an hour on a good day and only ten minutes on a bad day. (Tr. at 38-39.) He stated that when he sat too long his knees and legs started to cramp up and then his hips would start to hurt. (Tr. at 39.) He testified that he also had trouble carrying much weight; he stated he could carry a gallon of milk or a twelve pack of pop, but he could not carry a twenty-pound bag of potatoes very far. (Tr. at 39-40.) He could not lift a fifty-pound bag of soil. (Tr. at 40.)

Claimant testified that heat and humidity made it harder for him to breathe. (Id.) He stated that extreme cold bothered him, also, but not as much as heat and humidity. (Id.) He stated that activity also made his breathing worse, that if he went outside to try to push a lawn mower, he had

14

to come back in to use his inhaler or oxygen after just two passes. (Id.) He stated that he still tried to mow the lawn because, "I'm not going to lay down. I'm not going to give up. That's what people do and they wind up dying" (Tr. at 40-41.) Claimant testified that he tried to mow his law every two weeks, but it took him all day to mow a very small yard. (Tr. at 41.) He stated that he also did the weed eating because he had no choice. (Id.) He testified that he cooked about twice a week. (Id.) He stated that he did not do laundry but did do some vacuuming; he stated he avoided mopping because the cleaning chemicals in the water affected his breathing. (Tr. at 41-42.) He stated he vacuumed several times a week, but he took breaks while doing so. (Tr. at 42.) Claimant testified that he had trouble with losing his grip with his right hand and also had trouble buttoning his shirts. (Tr. at 42-43.)

Vocational Expert ("VE") Olin Dodd Testimony:

The VE testified that Claimant's past work as at an insulation installation company was medium skilled work; his work as a diesel mechanic was skilled medium work; and his work at Embassy Suites as a technical engineer would be classified as general building maintenance which is skilled medium work. (Tr. at 46.)

The ALJ asked the VE to consider an individual of the same age, education, and work history as Claimant, who was limited to lifting twenty pounds occasionally and ten pounds frequently; who could stand and walk six hours and sit six hours in an eight hour work day; who could never perform climbing of ladders, ropes or scaffolds; who could occasionally perform climbing of ramps, stairs, balancing, stooping, kneeling, crouching and crawling; who could not do jobs involving hazards, machinery, and heights; and who must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor

ventilation. (Tr. at 46-47.) The ALJ then asked the VE whether the individual could perform any of Claimant's past relevant work and the VE testified that he could not. (Tr. at 47.) The VE testified that the individual could perform unskilled light jobs such as small parts assembly worker, non-postal mail sorter, and garment bagger. (<u>Id</u>.)

The VE testified that if the individual described above would be off task on any given work day by thirty percent, there would be no jobs that the individual could maintain. (<u>Id</u>.)

In response to questions from Claimant's representative, the VE testified that if the above described individual would be absent from work at least three days per month, on an unscheduled basis, the individual would be not be able to maintain employment. (Tr. at 48.) The VE testified that if an individual were limited to sedentary work and could occasionally use his dominant hand for fine and gross manipulation, handling, and fingering; could have constant use of his left upper extremity; could never climb ladders, ropes, and scaffolds; could only occasionally climb stairs and ramps and perform other posturals; would need to avoid moderate exposure to any pulmonary irritants, extremes in temperature, and chemicals; and would have to avoid high concentration magnets, the individual could not perform any of the jobs he had previously cited. (<u>Id</u>.) The VE testified that there would be some sedentary jobs that might be consistent with the use of one upper extremity for greater than occasional use, such as surveillance system monitor, call out operator, and office clerk. (Tr. at 48-49.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant argues that the ALJ failed to consider two impairments at each step of the sequential evaluation, specifically, obesity and left ventricle systolic dysfunction. (Document No. 14 at 9.) Claimant points out that SSR 02-1p requires an ALJ to consider obesity at each step of

the sequential evaluation, as it can be a factor in increasing the severity of other impairments, and must be considered during the RFC assessment due to its functional limitations; failure to consider obesity is reversible error.[5] (Id. at 10-11.) Likewise, the ALJ did not consider Claimant's left ventricle systolic dysfunction, a condition related to his cardiac impairments that could have made a major difference in the RFC assessment, and remand is necessary to correct this error. Meadows v. Colvin, 2015 WL 3820609 (S.D.W. Va. May 26, 2015). (Id. at 12.)

Next, Claimant argues that the ALJ's step three finding is inadequate because it provided only summary conclusions that Claimant's impairments did not meet or equal the Listings without further explanation. (Id. at 13.) Additionally, the ALJ neglected to consider Claimant's impairments of obesity and left ventricle systolic dysfunction, despite documentation in the record that suggests that these impairments would have met or equaled the Listings, particularly with respect to his cardiac impairment, and the ALJ also neglected to consider whether Claimant's impairments in combination would have met or equaled the Listings, as these were only addressed separately. (Id. at 13-14.) Because of the lack of explanation denies meaningful review, remand is necessary. Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013); Fox v. Colvin, 632 Fed.Appx. 750, 755 (4th Cir. 2015). (Id.)

The Commissioner responds that the ALJ's decision is based on substantial evidence; at no time did Claimant assert obesity as a disabling impairment, the primary reason for his alleged disability was his cardiac condition. (Document No. 17 at 11.) Because Claimant did not identify obesity as a disabling impairment, remand for consideration thereof is not warranted[6], further,

---

[5] See, e.g., Lynch v. Commissioner of Social Sec. Admin., 2012 WL 1085766 (N.D.W. Va. March 30, 2012); Winston v. Astrue, 2012 WL 4086448 (E.D.N.C. Sept. 17, 2012)

[6] See Rutherford v. Barnhart, 339 F.3d 546, 553 (3d Cir. 2005).

there was no evidence in the record that indicated Claimant was functionally limited by obesity. (Id. at 11-12.) The Commissioner argues that the diagnostic findings of left ventricle systolic dysfunction and left ventricular hypertrophy are not separate impairments, only the cause of Claimant's cardiac dysrhythmias/late effects of transient ischemic attack (TIA), which the ALJ found as severe impairments, and considered same at each step of the sequential evaluation process. (Id. at 12.)

Next, the Commissioner contends that Claimant did not illustrate how left ventricle systolic dysfunction and left ventricular hypertrophy meet Listing 4.05 and the ALJ appropriately determined that Claimant's cardiac impairment did not meet the Listing based on the medical evidence of record. (Id. at 13-14.) Claimant's condition was controlled with medication and a pacemaker, therefore, the ALJ's finding was supported by substantial evidence. (Id. at 14-15.)

In reply, Claimant argues that the Third Circuit found Rutherford v. Barnhart inapplicable in cases such as the one at bar because the issue here is the impact of obesity in combination with other severe impairments. See Cooper v. Comm'r of Soc. Sec., 268 Fed.Appx. 152, 156 (3d Cir. 2008). (Document No. 18 at 1.) Also, the Commissioner provides *post hoc* rationale for the ALJ's findings, which was the ALJ's duty from the onset, only remand can correct the errors below. (Id. at 2.)

Analysis

Consideration of Obesity as Impairment:

There is no question that obesity was not mentioned at all in the ALJ's written decision. Social Security Ruling 02-1p states that in the absence of evidence to the contrary, a diagnosis of obesity from a treating source or consultative examiner will be accepted. See, 2002 WL 3468628

18

at *3. There is no question that Claimant was considered obese by treating physicians as noted *supra*, and there is no evidence contradicting that evidence. Indeed, Dr. Lo's Physical Residual Functional Capacity (PRFC) assessment included additional explanation where he noted that Claimant's Body Mass Index (BMI) was 34.6 (Tr. at 59.), which is considered "obese". Id. at *2. Obesity must be considered at the third step of the sequential evaluation when determining whether any impairment(s), alone or in combination, meets a listing, and must also be considered at steps four and five when assessing a claimant's functioning. Id. at *3. SSR 02–1p further provides:

> As with any other medical condition, we will find that obesity is a "severe" *impairment* when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual' physical or mental ability to do basic work activities. We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning . . . Therefore we will find that an *impairment*(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities. . ..

Id. at *4. (emphasis added)

In addition, SSR 02-1p states:

> However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

Id. at *6.

Pursuant to 20 C.F.R. § 404.1512(a), a claimant has the responsibility to prove that he is disabled, and to provide all evidence known to her that relates to his disability; "[t]his duty is ongoing and requires you to disclose any additional related evidence about which you become aware." Finally, "[w]e will consider only impairment(s) you say you have or about which we receive evidence." This affirmative duty has been echoed by the Fourth Circuit in its holding that

the burden of proof and production rests upon a claimant to show limitations. See, Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

The parties have cited persuasive legal authority in support of their respective positions with regard to Claimant's obesity. Further review of these cases may shed light on the question presented in this matter; for starters, the undersigned notes that in Lynch v. Commissioner of Social Sec. Admin., 2012 WL 1085766 (N.D.W. Va. March 30, 2012), that the case was remanded for further consideration of the claimant's obesity because the ALJ relied upon the State agency physician's PRFC which did not include or consider the claimant's diagnosis of obesity.[7] That is not what occurred in this case, however, because Dr. Lo included Claimant's BMI in his PRFC.

The undersigned also notes that an ALJ's failure to meaningfully discuss a claimant's obesity that had been noted numerous times in the record of evidence as a diagnosis warrants remand. Winston v. Astrue, 2012 WL 4086448 (E.D.N.C. September 17, 2012). In Winston, the court acknowledged that an ALJ's "seeming nonconsideration" of a claimant's obesity does not require remand when the record shows that obesity did not impair a claimant's ability to work. Id. at *4. However, in Winston it was acknowledged that obesity itself is an impairment and can magnify the severity of coexisting impairments:

> It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea. See SSR 02-1p, 2002 WL 34686281 at *3.

---

[7] The State agency consultant's PRFC predated a report from a treating physician that included a diagnosis of obesity; the court concluded the ALJ did not consider this diagnosis when determining the claimant's impairments or RFC. Id. at *13. This case is also notable for the fact that the claimant did not allege obesity as an impairment when he filed his applications for disability, during the hearing, or in subsequent pleadings. Id. at*2.

Winston v. Astrue, at *3.

In Rutherford v. Barnhart, 399 F.3d 546, 552-553 (3rd Cir. 2005), the claimant did not raise obesity as an impairment or limitation, but asserted SSR 00-3p (superseded by SSR 02-1p, without substantive changes) required remand for consideration of obesity. The Third Circuit adopted the analysis by the Seventh Circuit, that when a claimant does not allege obesity as an impairment or limitation, the references to a claimant's weight in medical records were likely sufficient to alert the ALJ to the impairment; in that case, obesity would not affect the outcome of the case. Id. Notably, the Seventh Circuit, and by adoption, the Third Circuit, found that "although the ALJ did not explicitly consider [claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctor's opinions." Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004).

In Cooper v. Commissioner of Social Sec., 268 Fed.Appx. 152, 156 (3d Cir. 2008), the Third Circuit revisited this issue, and held that where a claimant has specifically argued that obesity be considered as a disabling impairment, and the ALJ fails to do so, the case warrants remand. The notable difference between the Cooper and Rutherford cases is that in Cooper, the ALJ found the claimant's obesity to be a severe impairment at step two of the sequential evaluation, and therefore, obesity should have been considered in combination with the other impairments found at step three pursuant to SSR 02-1p. Id. The ALJ herein did not find Claimant's obesity was a severe or non-severe impairment. From that perspective, the undersigned disagrees with Claimant's view that the case at bar "is on all fours with the Cooper case". (Document No. 18 at 1.)

Another case, Miner v. Colvin, 1:12-2969-RBH, 2014 WL 4656383 (D.S.C. Sept. 17, 2014), presents a situation more akin to the case at bar: the claimant argued that the ALJ failed to consider obesity as one of her impairments in violation of SSR 02-1p. However, the court found

that while the claimant did not allege obesity as an impairment in either her application for disability benefits or in her testimony at the administrative hearing, and that her representative did not have anything additional to add to her claim at the close of the hearing, the ALJ did not err in failing to specifically consider obesity in his decision. Id. at *15. In further support of this finding, the court also cited an unpublished opinion that has bearing on the case at bar, Russell v. Chater, C/A No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) "(noting a claimant must explain the basis of his theory as to how obesity limits his functional ability; speculation is not permitted)." Id. In the case at bar, Claimant did not specifically allege obesity as a disabling impairment in his applications or at the administrative hearing, and his representative did not offer obesity as another basis of his claim that it limited him functionally.

The ALJ accepted the PRFC completed by Dr. Lo (and affirmed by Dr. Withrow), whose opinions the ALJ gave "great weight", to which the ALJ provided additional restrictions against concentrated exposure to wetness and humidity, "based on updated evidence received at the hearing level". (Tr. at 20.) Because Dr. Lo included Claimant's BMI in his explanation for the PRFC assessment, obesity was ostensibly a factor or condition he considered in assessing Claimant's functionality, therefore, pursuant to SSR 02-1p and the aforementioned persuasive legal authorities, the undersigned finds that remand would be unnecessary for the (re)consideration of Claimant's obesity either singly, or in combination with his other impairments. The undersigned finds that Claimant's argument that his obesity should have been factored into the ALJ's decision when Claimant himself did not raise obesity as a disabling impairment is akin to asking the Court to "make assumptions about the severity or functional effects of obesity combined with other impairments" that is expressly prohibited under SSR 02-1p. To do so is an invitation the engage

in *post hoc* rationale in order to remand the ALJ's findings, an invitation the undersigned recommends the Court decline. Accordingly, the undersigned finds that the ALJ did not err by not considering Claimant's obesity as an impairment.

<u>Consideration of Left Ventricle Systolic Dysfunction/Left Ventricular Hypertrophy as Impairments:</u>

The next issue concerns the ALJ's neglect to consider left ventricle dysfunction and/or left ventricular hypertrophy as additional impairments with regard to Listing 4.05. Claimant cites a May 2011 letter from the Cardiology Clinic to Dr. Marc Holbrook of the Federal Medical Center that included these conditions as additional diagnoses to "[TIA], hypertension, hyperlipidemia, history of neurocardiogenic syncope with dual-chamber pacer implanted", as well as "obesity". (Tr. at 367-369.) The record noted that the plan was to have Claimant begin losartan 100 mg 1 p.o. daily to help with his blood pressure as well as help with his left ventricular systolic dysfunction, which was reported to have an ejection fraction of 35%. (Tr. at 368.) The undersigned notes that left ventricular hypertrophy "(LVH) is a condition in which the muscle wall of heart's left pumping chamber (ventricle) becomes thickened (hypertrophy)."[8]

Contrary to Claimant's contention, the undersigned finds <u>Meadows v. Colvin</u>, 1:14-cv-15147, 2015 WL 3820609 (S.D.W. Va. June 18, 2015) inapposite to the case at bar: the ALJ in therein minimized the seriousness of the claimant's cardiac conditions and failed to acknowledge medical evidence of record that contained opinions from the claimant's treating cardiologists that contradicted the ALJ's findings, particularly with respect to the claimant's overall functioning. Plus, the ALJ in <u>Meadows</u> relied on opinion evidence that predated significant medical findings that indicated the claimant had reduced walking and standing capabilities. <u>Id</u>. at *16. This Court

---

[8] http://my.clevelandclinic.org/services/heart/disorders/left-ventricular-hypertrophy-lvh

has recognized that an "ALJ need not comment on every piece of evidence in the record." See, e.g., Cook v. Colvin, 2:13-cv-30155, 2015 WL 430880, at *17 (S.D.W. Va. Jan. 30, 2015).

In this case, the ALJ's failure to specifically address Claimant's left ventricular systolic dysfunction and/or left ventricular hypertrophy as individual impairments would have made no difference because the opinion evidence relied upon by the ALJ in determining Claimant's RFC also considered the evidence Claimant cites as "additional cardiac impairments".[9] Moreover, there was no evidence suggesting new or significant changes regarding Claimant's cardiac impairments after the State agency medical consultants reviewed the medical record of evidence. These facts distinguish the case at bar from the Meadows decision.[10]

Listing 4.05:

The Fourth Circuit has held that a summary conclusion that a severe impairment does not qualify as an impairment under the Listings without explanation, or fails to state why the impairment fails to qualify under the Listings, warrants remand. See, Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013); Fox v. Colvin, 632 Fed.Appx. 750, 753 (4th Cir. 2015). The ALJ's discussion of why Claimant's severe impairments did not meet or equal the Listings included more information and explanation that the "conclusory analysis that we found to be unacceptable in Radford." Fox, 632 Fed.Appx. at 754. The step three finding pertinent to this discussion was reproduced by the Fox Court:

Although the claimant has "severe" impairments, they do not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). No treating or examining physician has mentioned

---

[9] The undersigned notes that these hospital records were contained in the evidence from the University of Kentucky, identified as Exhibit 3F in the transcript, the same evidence that was received and considered by Dr. Lo (Tr. at 54.) and Dr. Withrow. (Tr. at 67.) The undersigned further notes that this Exhibit was extensively cited by the ALJ in his decision. (Tr. at 18, 19, 20.)
[10] See, generally, Allen v. Colvin, 2:15-cv-04162, 2016 WL 1529692 (S.D.W. Va. March 18, 2016).

24

findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments. In reaching this conclusion, the undersigned has considered, in particular, sections 9.00(B)(5) and 11.14.

Id. at 754-755.

In the case at bar, at step three in the sequential evaluation, the ALJ determined that Claimant's heart condition did not meet or equal the criteria of Listing 4.05

because he does not have recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled, recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by resting or ambulatory (Holter) eletrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope. (Tr. at 17.)

The ALJ also found that Claimant's COPD did not meet or equal the criteria of Listing 3.02 "because he does not have FEV values equal to or less than 1.55; nor chronic impairment of gas exchange; nor significantly abnormal arterial blood gas values (Exhibit 8F, p. 7)." (Id.) Further, the ALJ determined Claimant's history of lymphoma failed to meet or equal Listing 13.05 "because he does not have Hodgkin's disease with failure to achieve clinically complete remission, or recurrent disease within 12 months of completing initial antineoplastic therapy." (Id.)

The ALJ's step three analysis provided more information as to why he found Claimant's severe impairments did not meet or equal the pertinent Listings than those examples provided in the Radford and Fox cases. As noted above, the ALJ considered Claimant's severe impairments, which included "cardiac dysrhythmias/late effects of transient ischemic attack (TIA)" in his step three evaluation. To meet Listing 4.05, 20 C.F.R. Part 404, Subpt. P, App. 1 § 4.05 provides that a claimant must have:

Recurrent arrhythmias, not related to reversible causes . . . or drug toxicity, resulting in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope

or near syncope (see 4.00F3b), despite prescribed treatment . . . and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c).

The Regulations defines "uncontrolled" as an impairment does not adequately respond to standard prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00A3f. "Recurrent" means that the longitudinal clinical record shows that, within a consecutive 12-month period, the finding(s) occurs at least three times, with intervening periods of improvement of sufficient duration that it is clear that separate events are involved. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00A3c. Episodes of cardiac "syncope or near syncope" are defined as a periods of altered consciousness since syncope is a loss of consciousness or a faint. It is not merely a feeling of light-headedness, momentary weakness, or dizziness. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00F3b. In accordance with the required criteria of the Listing, the ALJ appropriately explained why he found Claimant did not meet Listing 4.05.

The undersigned notes that the ALJ examined the objective medical evidence of record, specifically concerning Claimant's heart condition, in support of his conclusions in subsequent steps in his analysis:

(1) University of Kentucky Hospital records dated April 19, 2011 for which Claimant presented with a history of CVA versus transient ischemic attack (TIA) with new onset of right-sided weakness and numbness, wherein Claimant was diagnosed with TIA, and that during his hospital stay his right-sided weakness improved "over a short period of time"; there were no acute findings concerning for a stroke"; and carotid Doppler, echo, and CT of Claimant's head were within normal limits". (Tr. at 18.)

(2) University of Kentucky records dated August 30, 2012 reported Claimant's history of paroxysmal atrial fibrillation and neurocardiogenic syncope status post pacer in June 2010; that Claimant's blood pressure was "well controlled on medication"; that Claimant experienced episodes of paroxysmal atrial fibrillation; and the following day, August 31, 2012, Claimant was started on Lovenox, an anticoagulant, since he only received aspirin for Afib and stroke prevention in prison. (Tr. at 19.)

(3) Charleston Area Medical Center records dated March 20, 2013 indicated Claimant went to the emergency department with complaints of a bad headache and possibility of another "stroke", which was assessed as TIA, however a CT scan of his head showed no abnormalities and the bilateral carotid duplex showed "very mild" stenosis in the right and "mild" stenosis of the left carotid arteries. (Id.)

(4) Kip Beard, M.D. evaluation dated April 10, 2013 stated Claimant reported that since receiving a pacemaker, he experienced three episodes of syncope, his last in 2012; examination of Claimant's pacer revealed regular rate and rhythm; no murmurs, gallops or rubs were noted as well. (Id.)

(5) Cleveland Clinic records dated July 2013 and September 2013 indicated Claimant had no arm swelling, syncope, pre-syncope, or pocket stimulation related to his pacemaker; in September 2013, the "percentage of ventricular events" was 2%; Claimant would be "followed with a telephone analysis every three months and a yearly clinical analysis." (Id.)

(6) Cleveland Clinic records dated December 11, 2013 reported Claimant had an electrophysiology study and ablation for his history of paroxysmal atrial fibrillation. (Tr. at 20.)

Despite Claimant's impairments, the ALJ found that he "has engaged in varied and robust activities of daily living including cooking, laundry, ironing, household cleaning, working in his garage, cutting grass, weed eating, vacuuming, and sweeping the porch." (Id.) Ultimately, the ALJ found Claimant was not as limited "to the extent one would expect[.]" (Id.)

It has been recognized that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Social Security Ruling 96-7p[11] clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis,

[11] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 16, 2016, however, SSR 96-7p was in effect at the time of the decision, November 7, 2014.

prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

From the foregoing, the ALJ provided ample citations to the evidence of record as to why he found Claimant was not as "limited to the extent as one would expect given the complaints of disabling symptoms" (Id.) when he considered the RFC. The undersigned does not agree with Claimant's assertion that the ALJ's decision amounts to the "lack of explanation" that requires remand. Mascio v. Colvin, 780 F.3d at 640. Accordingly, the undersigned finds that the Commissioner's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 14.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 17.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed

Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 19, 2016.

Omar J. Aboulhosn
United States Magistrate Judge